## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**BRANDON HOLLAND**                                          **PLAINTIFF**

v.                                  **CASE NO. 5:15-CV-05088**

**WASHINGTON COUNTY, ARKANSAS;**
**MARILYN EDWARDS, individually**
**and in her official capacity;**
**DAN SHORT, individually**
**and in his official capacity;**
**SHAWN SHRUM, individually**
**and in his official capacity; and**
**DONNIE COLEMAN, individually**
**and in his official capacity**                            **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Presently before the Court are Defendants Washington County's, Marilyn Edwards', Dan Short's, Shawn Shrum's, and Donnie Coleman's Motion for Summary Judgment (Doc. 11), and Plaintiff Brandon Holland's Response in Opposition (Doc. 17). The Motion is now ripe for decision. For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED**.

### I.      BACKGROUND

The Court recites the following facts in the light most favorable to Holland. *See Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). At all times relevant to this case, Holland was employed as a Heavy Equipment Operator ("HEO") for the Washington County Road Department (the "Road Department" or the "Department") in Washington County, Arkansas. The Defendants, aside from the County itself, were all officials and employees of the County: Marilyn Edwards was the County Judge—a position that is not judicial in nature, but is more akin to being the CEO for the County;

1

Dan Short was Edwards' Chief of Staff; Donnie Coleman was the Superintendent of the Road Department; and Shawn Shrum was the Assistant Superintendent of the Road Department (collectively, "Individual Defendants").

One morning during the late-summer or early-fall months of 2013, Jeff Williams, a then-candidate for County Judge of Washington County, stopped by the Road Department's shop with some doughnuts for Department employees. As a group of employees indulged in those treats, Williams spoke to them about certain changes in Department policies that he would enact if elected. Holland liked Williams' ideas, and decided at that time to support his candidacy for County Judge. A couple of weeks later, Holland began discussing his support for Williams in the Department shop's break room—a place where matters of politics were casually discussed along with other social happenings in the mornings before employees were dispatched to various worksites along the County's roads. He also discussed his support for Williams at the job site from time to time.

During October of that year, Holland saw Shawn Shrum at a local football game in Praire Grove, Arkansas. Shrum struck up a conversation with Holland about Williams, wherein Holland expressed support for his candidacy. What by all accounts was a cordial discussion ensued, with Shrum taking a position in support of the incumbent Judge, Marilyn Edwards.

Approximately two weeks later, on November 4, 2013, a Department employee named Justin Tyree abruptly resigned his position to take a higher-paying job elsewhere. Tyree's main job responsibility was to operate a backhoe on the Department's tile crew. Department Superintendent Donnie Coleman made the decision

2

to transfer Holland to the tile crew to replace Tyree, at least temporarily. Holland was previously assigned to operate a bulldozer on the new construction crew, a job which he preferred.

After spending approximately two weeks on the tile crew, Holland had a meeting with Shrum, Coleman, and another supervisor named Rusty Smith. At the meeting, Holland expressed his preference for returning to the new construction crew to operate a bulldozer. Shrum and Coleman declined to grant his request. About a week later, Holland's access to the County truck that he had previously used to commute to and from work was taken away. Also around that time, rumors began to swirl around the Department that Holland had been transferred to the tile crew because of his support for Williams. This led to a parking-lot confrontation between Holland and Shrum. In short, Shrum accused Holland of spreading the rumor, and Holland denied the accusation. Either Shrum or Holland suggested that they have a meeting the next day to resolve the matter.

The next day, a meeting was indeed held in Coleman's office between Holland, Coleman, Shrum, Smith, and another supervisor named Jeff Crowder. The meeting became heated, and both Holland and Shrum raised their voices at each other. At one point, Shrum went to go shut the door to Coleman's office, and Holland obstructed his ability to do so, stating that he had nothing to hide and wanted everyone to hear the conversation. Also during the meeting, Holland called Shrum "a lying piece of shit." (Doc. 19-1, p. 41). Towards the conclusion of the meeting, Shrum stated that Holland would not be allowed to operate a backhoe that day, for fear that he was too angry and would endanger his co-workers or ruin the equipment. Instead, Holland was assigned to

3

help remove dirt and snow that had accumulated in peoples' lawns as a result of plowing the County's roads. On that particular day the tile crew was working with inmates on a work-release assignment to complete that task.

Holland refused the assignment. After confirming that Holland was in fact refusing, Coleman called Dan Short to inform him of what had happened. Short discussed the matter with Edwards, and they agreed that the proper course of action was to fire Holland. Short arrived at Coleman's office shortly thereafter, confirmed that Holland was refusing his assignment, and told him that his employment with the Department was terminated.

Holland filed his Complaint (Doc. 1) on April 17, 2015, alleging that he was transferred and terminated because of his support for Williams, in violation of the First Amendment, the Arkansas Civil Rights Act ("ACRA"), and Arkansas common law. Defendants filed an Answer (Doc. 4) on July 7, 2015, generally denying Holland's allegations, and then moved for summary judgment on January 22, 2016. Defendants' Motion for Summary Judgment (Doc. 11) argues: (i) that Holland cannot make out a *prima facie* First Amendment violation because he cannot prove causation and because his transfer was not an adverse employment action; (ii) that even if he has made out a *prima facie* case, Defendants have shown a neutral justification for Holland's discharge; (iii) that even if Holland has proved a First Amendment violation, his rights were not clearly established, so the Individual Defendants are entitled to qualified immunity; (iv) that Holland has failed to prove County or official capacity liability; (v) that Holland has failed to prove a First Amendment prior restraint claim; and (vi) that Holland has failed to prove the Arkansas state tort of outrage. After reciting the legal standard for summary

4

judgment, the Court discusses Defendants' Motion below, and finds that it should be granted.

## II.    SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Union Elec. Co.*, 135 F.3d at 1212-13. The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

5

## III.   DISCUSSION

### A.   Holland's First Amendment and ACRA Claims

The parties agree that to "establish a prima facie case of retaliation, a plaintiff must allege and prove that: (1) [he] engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against [him]; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654-55 (8th Cir. 2007) (citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).[1] If a plaintiff meets this burden, "the burden shifts to the defendant to demonstrate that the same employment action would have been taken in the absence of the protected activity." *Id.* at 655 (citing *Mt. Healthy*, 429 U.S. at 287). "If the employer meets this burden, the burden shifts back to the employee to show that the employer's actions were a pretext for illegal retaliation." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008). "This third step of showing that a defendant's justification for firing is unworthy of credence is harder to overcome than the prima facie case because evidence of pretext is viewed in the light of the employer's justification." *Id.* Finally, "ACRA claims undergo the same analysis because the free speech protections of the Arkansas Constitution are no more generous than those of the First Amendment." *Stoner v. Ark. Dep't of Corr.*, 983 F. Supp. 2d 1074, 1099 (E.D. Ark. 2013) (citing *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 865 (8th Cir. 2009)).

---

[1] The parties do disagree, however, about whether the Title VII case *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), replaces the "substantial or motivating factor" standard announced in *Mt. Healthy* with a "but for" causation test. For reasons which will become obvious, the Court need not settle this dispute, and will assume for the purposes of this Opinion that the *Mt. Healthy* standard still applies to the First Amendment.

6

## 1. Holland's *Prima Facie* Case

The Court finds that Holland can establish a *prima facie* First Amendment violation by the narrowest of margins. As a preliminary matter, in reaching this conclusion, the Court assumes that Holland engaged in activity protected by the First Amendment, a point not contested by Defendants. It also assumes that Holland's transfer to the tile crew was an adverse employment action, an assumption which in any event has some merit given that the transfer resulted in his loss of access to a County truck. *See Pessoa Const. Co. v. N.L.R.B.*, 507 F. App'x 304, 307-08 (4th Cir. 2013) (unpublished) (finding that a change in vehicle-use policy that prohibited plaintiff from commuting in his company vehicle was an adverse employment action); *Murry v. Entergy Ark., Inc.*, 2012 WL 2450812, at *9 (E.D. Ark. June 27, 2012) (concluding that a job transfer resulting in a plaintiff's loss of access to his company vehicle used for commuting was an adverse employment action).

Focusing now on the third prong of the *prima facie* test, Holland argues that both his termination and his transfer to the tile crew were adverse employment actions motivated by his protected activity.

Addressing his termination first, the record is clear that Short and Edwards made the decision to terminate Holland.[2] The record is equally clear that Edwards and Short

---

[2] *See* Doc. 13-2, ¶ 5 (Edwards Aff.) ("After a brief conversation, Mr. Short and I agreed that termination was the appropriate response in light of Mr. Holland's actions that morning."); Doc. 13-3, ¶ 5 (Short Aff.) ("After speaking with Shrum, I met briefly with the County Judge, Marilyn Edwards, and we agreed that termination was the appropriate response in light of Mr. Holland's actions that morning."); Doc. 13-5, ¶ 5 (Coleman Aff.) ("I was not involved in the formulation of the decision to terminate Mr. Holland . . . ."); Doc. 13-6, ¶ 5 (Shrum Aff.) ("I was not involved in the decision to terminate Mr. Holland . . . .").

7

had no knowledge of Holland's support for Williams' candidacy or opposition to Edwards'.[3] Because Holland cannot show that the defendants who made the decision to terminate him even knew of his protected activity,[4] it would be impossible for a reasonable jury to conclude that his protected activity was a substantial or motivating factor in their decision to do so. *Cf. Wolff v. Berkley Inc.,* 938 F.2d 100, 103 (8th Cir. 1991) ("[A] causal link does not exist if the employer is not aware of the employee's statutorily protected activity."). Accordingly, Holland's termination cannot be used to establish his *prima facie* claim.[5]

Holland's transfer to the tile crew is a closer call. It is undisputed that it was Coleman's decision to transfer Holland.[6] Coleman, like Short and Edwards, asserts that

---

[3] *See* Doc. 13-2, ¶ 6 (Edwards Aff.) ("I did not learn of Mr. Holland's purported support of Jeff Williams (and/or opposition to me) in the County Judge's race, or of his conversation with Shawn Shrum at a football game regarding the same, until well after Mr. Holland's termination."); Doc. 13-3 ¶ 6 (Short Aff.) (also denying such knowledge).

[4] At several points in his Response Brief (Doc. 18) Holland concludes that Shrum made the decision to fire him. This conclusion is simply not supported by the record citations he offers for the proposition. For example, Holland declares that it was "Shrum's decision to terminate Plaintiff, and he had the authority to do it." (Doc. 18, p. 8). He then cites to an excerpt from Shrum's deposition testimony that may lend support to the latter claim (that Shrum had the authority to terminate Holland) but does nothing to support the former (that Shrum did terminate Holland). (Doc. 19-7, p. 103). Showing that Shrum had the authority to terminate Holland is far from tantamount to showing that he in fact did.

[5] Even if Holland's termination could be used to establish his *prima facie* claim, the Court would find that Defendants have offered a neutral justification for his termination—namely, his actions during the meeting in Coleman's office. Nothing that Holland has offered in response, moreover, indicates that this justification is pretextual.

[6] *See* Doc. 19-7, p. 132 (Shrum Dep.) ("Q: Okay. And I can't remember, you may have answered this, but whose decision was it to move Mr. Holland to the tile crew? A: Donnie's."); Doc. 19-9, p. 201 (Coleman Dep.) ("Q: Okay. Mr. Holland was transferred to the tile crew? A: I – I did that because I – whenever I hired Mr. Holland he owned his own backhoe and dump truck."); Doc. 13-5, ¶ 2 (Coleman Aff.) ("In early November,

he was completely unaware of Holland's support for Williams at the time he made the decision. The evidence supporting this assertion is substantial.[7]

The evidence to the contrary offered by Holland is thin, and consists in significant part of conjecture and speculation. For example, Holland insinuates that Coleman must have known about his support for Williams due to Coleman's office's proximity to the break room—where Holland frequently discussed politics—and because Coleman had office spies who reported the content of political conversations back to him. For example, a former Department employee, Michael McCoy, stated that "Donnie Coleman's office was close to the breakroom, and he could hear conversations that occurred in the breakroom. Also, it was well known that certain employees reported the political conversations back to Donnie Coleman." (Doc. 19-5, ¶ 2). Another former employee, Fred Davis, opined that he was "98-percent" sure, but "could be wrong" that three mechanics were "snitches" who would spread what they heard in the break-room around the office. (Doc. 19-2, pp. 16-17). Even when viewed in the light most favorable to Holland, the Court cannot say that any of this indicates that Coleman knew of Holland's support for Williams. Unsubstantiated speculation about workplace snitches will not help Holland carry his burden at summary judgment. *See Bloom v. Metro Heart*

---

2013, I made the decision to move Brandon Holland from the new construction crew to the tile crew."); *id.* at ¶ 3 ("I made the decision to move Mr. Holland . . . on my own . . . .").

[7] *See* Doc. 13-5, ¶ 3 ("At the time that I moved Mr. Holland to the tile crew in November, 2013, I had not heard of Mr. Holland's purported support of Jeff Williams and/or opposition to Judge Edwards' candidacy in the County Judge's race and had not heard of his conversation with Shawn Shrum at a football game regarding the same."); Doc. 19-9, p. 212 (Coleman Dep.) (Q: "Did you have any idea that [Holland] was supporting Jeff Williams? A: No."); Doc. 13-6, ¶ 2 (Shrum Aff.) (declaring that he did not tell anyone except his wife about the football-game conversation with Holland because "it was such a normal conversation" and he "thought very little of it").

*Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006) (declaring that "speculation and conjecture are insufficient to defeat summary judgment").

Holland also argues that Coleman must have known about his support for Williams because he informed Coleman of his political preference himself. Holland declared in his affidavit that, "Donnie Coleman knew that I supported Jeff Williams. I told him about the conversation with Shawn Shrum at the football game, and I told him that I supported Jeff Williams." (Doc. 19-4, ¶ 4). The first clause of this statement is conclusory, and thus is not entitled to any weight at summary judgment. *E.g.*, *Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993) ("Conclusory affidavits do not provide a basis upon which to deny motions for summary judgment."). The second two clauses do not support Holland's *prima facie* case either.[8] These clauses do not at all indicate *when* Holland informed Coleman of his support for Williams—it may have been well after his transfer. That conclusion is consistent with the sheer lack of any deposition response indicating that Holland told Coleman of his conversation with Shrum or his support for Williams, facts which would seem obvious to have mentioned at several points.[9] It is also consistent with Holland's framing of the timing in his

---

[8] As an aside, while at first glance these two clauses appear to be hearsay, the Court finds that they may be admissible. Neither statement necessarily needs to be admitted for the truth of the matter asserted—that the conversation with Shrum actually happened or that Holland actually supported Williams, respectively—to evince Coleman's knowledge of Holland's support for Williams. The fact of the conversation alone is evidence.

[9] *E.g.* Doc. 19-1, p. 9 ("Had you made it known in any way prior to your termination from the county that you were supporting Jeff Williams?"); *id.* at p. 13 ("Other than conversations in the break room did you share your support for Jeff Williams in the election in any other way prior to your termination?").

Response Brief and Statement of Material Facts in Dispute.[10] Accordingly, inferring that Holland told Coleman of his support for Williams *before* Coleman's decision to transfer him would be unreasonable, and cannot form the basis of Holland's *prima facie* case. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) ("Courts are required to view the facts and draw *reasonable* inferences in the light most favorable to the party opposing the summary judgment motion.") (quotation and alteration omitted) (emphasis added).

Discounting the conjecture about workplace informants and Holland's above declaration leaves only two comments by Holland's immediate supervisors—to the effect that Holland's transfer was politically motivated. First, the new construction crew supervisor, Rusty Smith, supposedly told Holland that he *would* be moved in retaliation for supporting Williams. *See* Doc. 19-1, p. 32 (Holland Dep.). Second, Holland states that Smith told the tile crew supervisor, Jeff Crowder, and then Crowder told him, that he was transferred in retaliation. *See id.* at 66; Doc. 19-13, p. 2. As a threshold matter, the Court must determine whether Holland's self-serving recollection of his supervisors' statements are inadmissible hearsay or vicarious admissions against the County Defendants. The latter can be used as evidence in opposition to summary judgment, whereas the former cannot.[11] The distinction here is a close call, but the Court finds

---

[10] *Compare* Doc. 18, p. 5 ("Plaintiff told Coleman about the conversation with Shrum at the football game, and Shrum's displeasure of Plaintiff's political positions. Coleman responded by telling Plaintiff to stop engaging in political speech because 'stirring up shit on the job wasn't good for the County.'") (quoting Doc. 19, ¶ 11), *with* Doc. 19, ¶ 11 ("Approximately *two weeks after* Plaintiff's move to the Tile Crew, Plaintiff requested a meeting . . . . At this meeting, Coleman became upset and told Plaintiff that 'stirring up shit on the job wasn't good for the County.'") (emphasis added).

[11] Generally speaking, hearsay is an out of court statement offered in court to prove the truth of the matter asserted in the statement. *See* Fed. R. Evid. 801(c). Subject to several exceptions, hearsay is inadmissible at trial. *See* Fed. R. Evid. 802. A district

these statements to be vicarious admissions under Federal Rule of Evidence 801(d)(2)(D).

A statement offered against an opposing party is not hearsay. The same is true for statements "made by [a party opponent's] agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). The crux of the issue here is whether the alleged statements were made within the supervisors' scope of employment. See *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 636 (8th Cir. 2007) ("[T]o gain admission of a statement, the proffering party must show that the statement was within the declarant's scope of employment."). Crowder and Smith are supervisors of the crews that Holland was transferred to and from, respectively. While it was Coleman's decision alone to transfer Holland from the new construction crew to the tile crew, that fact does not preclude a finding that the matter was also within the scope of employment of more immediate supervisors. *Accord Wilson v. Budco*, 762 F. Supp. 2d 1047, 1061 (E.D. Mich. 2011) ("Whether something is within an employee's scope of employment extends beyond matters involving direct decision makers."). Thus, for purposes of this motion, the Court finds that matters pertaining to Holland's transfer from one crew to the other were within the scope of Smith's and Crowder's employment,

---

court adjudicating a motion for summary judgment "must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial." *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). Accordingly, "[i]nadmissible hearsay evidence alone may not defeat a summary judgment motion." *Id.*

and therefore the statements Holland attributes to them will be treated as vicarious admissions in opposition to summary judgment.[12]

Viewing the import of the statements in Holland's favor, it can be argued that Coleman both knew about Holland's support for Williams and used that support as a substantial or motivating factor in transferring him to the tile crew. The statements, therefore, support and complete Holland's *prima facie* First Amendment case.

## 2.    Burden Shifting

Since Holland has made out a *prima facie* First Amendment case, the burden shifts to Defendants "to demonstrate that the same employment action would have been taken in the absence of the protected activity." *Davison*, 490 F.3d at 655 (citing *Mt. Healthy*, 429 U.S. at 287). The Court finds that Defendants have met this burden. Shortly before Coleman transferred Holland to the tile crew, one of the two backhoe operators on the tile crew, Justin Tyree, quit abruptly. (Doc. 19-9, pp. 201-203). Before working for the County, Holland owned and operated his own backhoe service for four years. (Doc. 19-1, pp. 33-34). This made him an experienced backhoe operator by any measure. Coleman was aware of Holland's backhoe experience, and transferred him to the tile crew to replace Tyree because of it. (Doc. 19-9, pp. 201-02). Tyree's abrupt resignation, coupled with Holland's experience operating a backhoe, shows that the

---

[12] Even in reaching this conclusion, the Court remains somewhat skeptical about the reliability of the statements in question. No deposition or affidavit from Smith—the source of these bits of information—appears on the record. And, there is hearsay evidence that Smith denied having ever made the statements in question. *See* Doc 19-7, pp. 136-37. Both the uncertainty about whether Smith made the purported statements and the lack of information about his basis of knowledge for them would be factors the Court would have considered at trial before deciding admissibility. *See* Fed. R. Evid. 104(a) and 403. Nonetheless, at this summary judgment stage, the Court will consider the statements.

same employment action would have been taken in the absence of Holland's support for Williams. *See e.g.*, *Altonen v. City of Minneapolis*, 487 F.3d 554, 561 (8th Cir. 2007) (evidence that plaintiff's "reassignment followed the resignation of the administrative services director which caused a shift in positions throughout the department" helped defeat her argument that her protected speech was a motivating factor in her reassignment).

Since Defendants have demonstrated that Coleman would have transferred Holland regardless of his support for Williams, "the burden shifts back to [Holland] to show that [his] employer's actions were a pretext for illegal retaliation." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008). "This third step of showing that a defendant's justification for [an adverse employment action] is unworthy of credence is harder to overcome than the prima facie case because evidence of pretext is viewed in the light of the employer's justification." *Id.*

Holland offers several facts purporting to demonstrate that Coleman's justification for transferring him is pretext. For example, he asserts that the tile crew only operated one backhoe the entire time that he was there; that the crew already had an experienced backhoe operator; and that the backhoe operator, Shannon Hilcher, was moved from operating a backhoe to performing other tasks when Holland was transferred. He also notes that the backhoe to which he was assigned had a completely different control system than his personal backhoe.

Viewed in the light of Coleman's justification, none of the evidence offered by Holland shows that the justification is pretextual. Justin Tyree, one of the two backhoe operators on the tile crew, abruptly quit his job. Coleman had Holland, an experienced

14

backhoe operator, operating a bulldozer on the new construction crew. Meanwhile, four other members of the new construction crew could operate a bulldozer. (Doc. 19-9, p. 204). The confluence of Holland's experience operating a backhoe, the limited number of workers on the tile crew who could operate a backhoe,[13] and the substantial number of workers on the new construction crew who could operate a bulldozer made it perfectly logical for Coleman to transfer Holland to the tile crew. None of the facts offered by Holland undermine this obvious justification.

In sum, although Holland narrowly established a *prima facie* First Amendment case, his claim nevertheless fails as a matter of law because he cannot show that Defendants' "legitimate, nondiscriminatory" justification for transferring him is prextextual. *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 760 (8th Cir. 2004). Coleman would have made the decision to transfer Holland irrespective of Holland's support for Jeff Williams. For these reasons, Holland's First Amendment[14] and ACRA claims cannot survive summary judgment.

---

[13] Holland erroneously states that "every member of the Tile Crew had as much experience operating a backhoe" as he did "which Coleman admitted in his deposition." (Doc. 18, p. 7). Coleman admitted no such thing. While he does admit some members of the *current* tile crew have experience operating a backhoe, Doc. 19-9, p. 208 ("[W]ho's *presently* on the tile crew?") (emphasis added), he stated that at the time he transferred Holland only one person on the tile crew could operate a backhoe. *Id.* at 208; *see also id.* at 209 ("Q: Okay. Were there other people in the tile crew who could run a backhoe? A: Not back then.").

[14] In addition to his First Amendment retaliation claim, Holland also alleged a First Amendment prior restraint claim. The Court finds that the reasoning discussed herein applies with equal force to the prior restraint claim, which also cannot survive summary judgment. *See also Braswell v. Washington Cnty.*, 2016 WL 1178795, *8 (W.D. Ark. March 23, 2016) (discussing the similarities between retaliation and prior restraint in the employment context).

## B.    Holland's Outrage Claim

In *Braswell v. Washington County*, which is somewhat of a sister case to the instant one, the Court reviewed in some detail the high bar to establishing the tort of outrage in Arkansas. 2016 WL 1178795, *10-11 (W.D. Ark. March 23, 2016). In that case, the Court explained that the "indignities and harms incurred by Braswell" were "in line with the Arkansas Supreme Court cases rejecting an employee's outrage claim." *Id.* at *11. The Court believes that statement to be even more applicable in the instant case. Accordingly, for the same reasons it granted summary judgment on the outrage claim in *Braswell*, the Court now grants summary judgment in favor of Defendants on the same issue.

## C.    A Few Words About *Braswell*

A casual observer comparing the outcome of the First Amendment and ACRA claims in *Braswell* with the outcome of this case may be puzzled. The Court allowed Braswell's claims against the County and a group of individually named defendants to go forward. It has now held that Holland's seemingly similar claims cannot. However, a closer juxtaposition of the two cases reveals that they are quite different. For instance, much of Braswell's protected activity revolved around statements he made about the construction of two bridges, and other safety-related matters. There was no question that all of the *Braswell* defendants were aware of these statements, and there was a substantial amount of additional causation-related evidence offered by Braswell. Had Braswell relied solely upon his support for Williams as his protected activity—as Holland did—the outcome of that case may have been significantly different. Moreover, whereas Defendants in the instant case suggested credible neutral justifications for the adverse

16

employment actions, the defendants in *Braswell* offered no comparable justifications. Lastly, the focus of the issues at summary judgment was much different in *Braswell*. There, the primary issue was whether Braswell had incurred an adverse employment action. In the instant case, the primary issue was whether Holland could establish causation, and then pretext. Thus, while the parties and the causes of action in the two cases are similar, the cases themselves are quite distinguishable.

## IV.   CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. 11) is **GRANTED**. The Court will effect this Order by entry of a separate Judgment to be issued on this same date.

**IT IS SO ORDERED** on this \_\_\_\_\_ day of April, 2016.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE